[Civ. No. 6559. Second Appellate District, Division Two.—April 8, 1931.]

ROBERT G. WILSON, Appellant, v. WALTER J. WALLACE, Respondent.

McAdoo, Neblett, O'Connor & Clagett and Edward H. Mitchell for Appellant.

Faries & Williamson and McIntyre Faries for Respondent.

ARCHBALD, J., *pro tem.*—Plaintiff, a member of the firm of Wilson & Wagner, of Washington, D. C., income tax experts, and an assignee of said firm, filed his complaint for the reasonable value of services alleged to have been performed by the copartnership for defendant, under an alleged contract in writing, in defending the latter in certain proceedings initiated by the government to collect a tax and penalties aggregating $2,147,065.27. At the close of plaintiff's case in chief the defendant moved for a nonsuit on the ground that the facts proved by plaintiff were not sufficient to justify a judgment in his favor, in that they showed "that there was no written contract entered into between the parties hereto for the employment of the plaintiff, and certainly no written contract for the payment of money to him, and that, therefore, his action is barred by the statute of limitations". From an order granting said motion and from the judgment entered thereon plaintiff appeals.

It is contended by appellant that certain letters and telegrams introduced evidence the written contract of employment; that while no express promise to pay for the services to be rendered is in writing, the law implies such a promise as an integral part of the written contract of employment; that the contract is one founded upon an instrument in writing within the meaning of subdivision 1 of section 337 of the Code of Civil Procedure, and that the action is not

barred by subdivision 1 of section 339 of the Code of Civil Procedure, as claimed by respondent.

March 20, 1925, defendant wired plaintiff's firm that he had received a statement showing additional tax and penalty assessed which he thought was settled two years previously, and in addition said: "Am forwarding copies by aeroplane mail stop please advise fully immediately." The copies referred to were forwarded as stated, in a letter addressed to plaintiff which reads, in part: "March 20, 1925. . . . My dear Bob: You can imagine how greatly surprised I was today to receive notice of additional tax for the year 1918, per copies enclosed. However, I feel sure this notice is incorrect and confident that you closed the matter when I paid some $114,000 during 1923, but I shall feel relieved to receive a telegram stating your ideas. I have not acknowledged receipt of the report, assuming that thirty days are allowed to present protest, and also awaiting your advice as to whether to sign it or have you handle it there. . . . W. J. Wallace." Upon receipt of defendant's telegram plaintiff wired in return as follows: "Statute of limitations has expired against your eighteen and nineteen assessments except on allegation of fraud stop fraud claim untenable . . . we will investigate fully and wire further Monday don't worry." March 23, 1925, plaintiff again wired defendant as follows: "Walker and I just had encouraging interview with chief of section in control of case stop forwarding protest for signature upon return will have formal hearing before Solicitor internal revenue." Upon receipt of above wire defendant wired plaintiff; " . . . am at loss to understand need of formal hearing if statute of limitations has expired stop please explain stop will be glad to have additional information when you obtain same Harry or I will be glad to leave on short notice if you need either or both of us." Plaintiff replied with a wire dated March 24, 1925, reading as follows: "Statute has expired but commissioner may make assessments any time upon alleged fraud stop department claims income should have been returned for stock received on basis intrinsic value company assets and therefore technical fraud exists stop satisfactory informal meeting with solicitor today must proceed with formal hearing which will be arranged within few days stop certain of indefinite delay in event

unfavorable developments and confident ultimate success in any event stop better leave matter with us will call you here if necessary or advisable stop letter received writing fully.''

March 24, 1925, a letter marked personal was sent by plaintiff to defendant, reading in part as follows: ''Just as a suggestion it might be well for you to reach an understanding with Mr. Bauer with respect to the matters covered by sundry other letters of this date, perhaps similar to the arrangement you had with him when the controversy with the department arose in 1922. . . . While we are confident of the ultimate success of our efforts, the matter is obviously one not to be trifled with and demands the closest and most careful consideration possible. I might mention, in this connection, that I can conceive of no one better qualified to handle this particular subject than our Mr. Walker, who with the writer is devoting full attention to the case. It is impossible, of course, at this time to estimate the amount of compensation and expense that may be involved, but we do think that you might well now come to an understanding with Mr. Bauer. We assume that neither you nor he wishes us to let any stone unturned in the endeavor to bring about an entirely satisfactory disposition of the Department's contentions.'' The Mr. Bauer referred to is Mr. Harry J. Bauer, referred to in one of the defendant's telegrams as ''Harry'', who was counsel for defendant and also associated with him in a business deal which gave rise to the controversy with the government in 1922, referred to in the letter, and which was settled with the government on the basis of a value of $28.50 per share for the stock of the Wallace Refineries, which was received by defendant. Later someone in the department found that in connection with the determination of the tax liabilities of the Wallace Refineries the underlying assets were valued on a basis which gave to the stock a much higher value than $28.50 per share in 1918, and out of this the claim for additional assessment and penalties developed.

On March 24, 1925, plaintiff sent another letter to defendant which explained how the additional tax and penalties came to be assessed, and told of meetings had with various officials in the department in regard to the matter. This letter also said, in regard to the conference concerning the

tax: "Mr. Walker and I immediately made an informal but strong oral protest to Mr. Carter [Chief of the Special Adjustment Section], and returned to meet with him again this morning. In view of the fact that the result of any consideration by the Special Adjustment Section must be referred to the office of the Solicitor for consideration in any event, we persuaded Mr. Carter to consent to a joint formal hearing before the Solicitor and to be present personally at such hearing. The Department having issued a formal letter to you under the stringent rules of procedure of the Department a formal protest cannot be avoided. Later we met with Mr. Cannon, Assistant Solicitor of Internal Revenue and head of the 'Penal Section'. Had quite a satisfactory informal discussion with him, completed arrangements for the joint hearing and obtained his agreement to attend the hearing personally. We are confident this is the wisest move. Mr. Walker and I have just completed a draft of formal protest, which will be mailed to you as soon as typed—tonight, if possible. Please sign before a notary the original and two copies thereof and return to us as quickly as possible, retaining a copy for your files. . . . We have arranged to file unsigned copies of the protest with Mr. Cannon and Mr. Carter at once, in order that they may become familiar with our formal defense and the departmental records and arrange a hearing, at which time we will present the signed originals, at the earliest possible date. . . . Mr. Walker and I are giving it the most careful attention, are proceeding we believe in the proper manner, and will allow nothing else to interfere with it." Another letter was also sent defendant by plaintiff the same day, in which the latter said: "In view of the fact that the existing power of attorney runs in favor only of Mr. Wagner and myself, I now enclose a new form that will enable Mr. Walker or any other member or associate of our organization to appear before the Treasury Department in your behalf. Please execute in duplicate and return both signed powers immediately."

The evidence shows that defendant executed and acknowledged this power of attorney before a notary public on April 1, 1925, and signed and verified the protest sent him by plaintiff on March 31st. Both power of attorney and protest were sent plaintiff by defendant in a letter dated

April 1 and were received by plaintiff in due course of the mail. The letter reads in part as follows, the italics being ours: "I am enclosing herewith original and two copies of Formal Protest, in connection with the recent reassessment of tax and penalty received by me, and properly executed by me, also original and copy of Power of Attorney to you and your associates, executed in proper form. This letter will also acknowledge receipt of your telegram advising that the formal hearing on this protest had been set for Saturday, April 11th. . . . My reason in setting forth this statement of the situation with which I am now confronted is to put the matter squarely before you to secure your opinion whether I may be subjected to embarrassment in arriving at a satisfactory settlement of this latest re-assessment *by continuing to have your firm represent me,* in view of the fact that you have taken an inconsistent attitude with reference to a matter involved in my case when you were representing the Wallace Refineries. . . . I am sure you can realize and appreciate my standpoint in this matter, and wish you to give it very serious consideration prior to the date set for formal hearing on the protest. My attorney, Mr. Millar, will arrive in Washington Wednesday morning, April 8th, and will confer with you immediately upon his arrival. . . . If possible to delay the matter of filing the Formal Protest, which I have executed, until after his arrival, he would like the opportunity to discuss the situation thoroughly with you and learn your viewpoint, and he may have some further suggestion to make in regard to taking this matter up with the Department. . . . The other matters suggested in your *personal* letter will also have to await Mr. Bauer's return to the city, and the final decision of all those concerned in the matter of *continued representation* by your firm." Thereafter and on April 8th Mr. Millar sent a telegram to defendant, from Washington, in which he said, among other things: "Conferred fully with Wilson and Walker today stop they take view no embarrassment results from their connection as counsel for Wallace Refineries . . . They express complete willingness to withdraw from the case upon any indication of unfavorable effect but believe that withdrawal in advance of hearing after contact with department already favorably established and in view of intimate knowledge all details might prove boomerang to

you stop my friend Winton sailed today for Europe will be back May nine Wilson and Walker both think should not appeal to him unless developments unfavorable in department stop I am convinced above procedure best policy at present and will sit in at conference Saturday."

Various other letters and telegrams thereafter passed between the parties relative to the progress of the case, in one of which, dated April 20, 1925, defendant wrote plaintiff the following: "Just a personal note to let you know how much I appreciate the conversation we had over the telephone last night regarding my tax matters. . . . Your assurance that it will all be adjusted satisfactorily is a great help to me and I know you are more capable of handling the situation than anyone; would like to talk to you regarding some other matters which this case has brought . . . " Finally, on August 17, 1925, plaintiff wired defendant's secretary: "Your telegram received on return from brief vacation. Glad to inform you we have now seen solicitor's favorable opinion which is final"; to which defendant wired his reply as follows: "I am pleased to receive information contained in your wire Miss Heron stop expect to make special trip east in early fall when I can express more personally to you my appreciate [*sic*] of your services."

██ Apparently the first that plaintiff knew of the controversy between defendant and the government was upon the receipt of defendant's telegram advising him of the additional tax and penalties and which asked him to "advise fully immediately". If this stood alone, in view of the fact that defendant says it was his "understanding this entire matter was settled two years ago", the request for advice might be taken to mean advice as to how it happened, by reason of his understanding, rather than the beginning of a new employment. Defendant's letter transmitting to plaintiff the statement referred to in the telegram, however, has this very significant language: "I have not acknowledged receipt of the report, assuming that thirty days are allowed to present protest, and also awaiting your advice as to whether to sign it, or have you handle it there." While it is possible to urge that defendant in the use of this language did not intend to leave it to the judgment of plaintiff whether he would handle the case but sought to ascertain if plaintiff proposed to handle it as a part of the former case and on

the fee paid therefor by reason of his failure to close the old case so there could be no such "comeback" on defendant, yet the other intendment favorable to plaintiff's case, that defendant was leaving it to the former to handle if so advised, could fairly and reasonably be made, and plaintiff's letter and telegrams are plainly susceptible to the inference of an intention on his part to handle the controversy, one of them containing the statement, "better leave matter with us". Later, when matters had so progressed that it was necessary to appear at a formal hearing before the department, plaintiff felt that a new power of attorney was necessary in order that Mr. Walker (apparently a new member of the firm) or any other associate could appear and represent defendant. He therefore asked that such new power be executed and defendant complied with the request, the record showing that it was filed with the department. Certainly it might reasonably be inferred therefrom that defendant had authorized plaintiff's firm, in writing, to handle the controversy, and the inference that plaintiff accepted may fairly be made from his letters and telegrams.

We are not here concerned with the question whether if the case had been submitted on the merits, on the evidence introduced by plaintiff, the court could have properly found that there was no written contract, or any contract of employment. On a motion for nonsuit the court cannot weigh the evidence if it is conflicting, or choose between conflicting inferences that may be drawn from the same evidence, but "the evidence, and every inference that may be fairly drawn from it must be viewed in the light most favorable to plaintiff". (*Carter* v. *Canty,* 181 Cal. 749, 755 [186 Pac. 346, 349].) "On such motion the evidence must be taken most strongly against the defendant, contradictory evidence must be disregarded and the motion denied if there is any substantial evidence to prove plaintiff's case without passing on the sufficiency of such evidence." (*Grummet* v. *Fresno Glazed Cement Pipe Co.,* 181 Cal. 509, 512 [185 Pac. 388, 389 ].) The rules are the same whether the trial is by the court or by a jury (*Grummet* v. *Fresno etc. Co., supra*), and if, as seems to be the case here, two inferences may fairly be made from the plaintiff's evidence, the trial court must take the one most favorable to plaintiff. (*Globe Grain & Milling Co.* v. *Drenth,* 36 Cal. App.

156 [171 Pac. 821].) So we must conclude that, giving plaintiff the benefit of the favorable inferences which may fairly be drawn from the evidence, the motion for nonsuit should have been denied unless, as respondent urges, it is necessary in addition to the contract of employment being in writing that the promise to pay compensation to the employee must also be in writing.

It appears from the record that the complaint was filed more than two but less than four years after the alleged contract was made, and in consequence if the promise to pay plaintiff compensation for his services is required to be in writing the statute of limitations would affirmatively appear, on the face of ·the record, to be a complete defense to his claim as a matter of law. Under such circumstances a motion for nonsuit is properly granted. (*Vinson* v. *Los Angeles Pac. R. R. Co.,* 147 Cal. 479 [82 Pac. 53] ; *Beeson* v. *Schloss,* 183 Cal. 618 [192 Pac. 292].) On this point respondent urges that such promise to pay compensation must be in writing, while appellant contends that, the contract of employment being proved by instruments in writing, the promise to pay compensation is necessarily implied by law and needs no proof extrinsic to the writings, and that in consequence the action is one founded upon an instrument in writing, within the meaning of subdivision 1 of section 337 of the Code of ·Civil Procedure, and was not barred at the date upon which the complaint was filed.

The case of *McCarthy* v. *Mt. Tecarte L. & W. Co.,* 111 Cal. 328 [43 Pac. 956], is one in which a director of the defendant corporation sued for the reasonable value of his services as general manager and superintendent under a resolution of the board so appointing him, which resolution, however, made no reference to compensation for such services. The Supreme Court held that the cause of action was not barred by subdivision 1 of section 337, and in order to so hold the trial court must have found under the facts that the action was founded upon an instrument in writing. The opinion at page 340 contains this language: "But a cause of action is not upon a contract founded upon an instrument in writing, within the meaning of the code, merely because it is in some way remotely or indirectly connected with such an instrument, or because the instrument would

be a link in the chain of evidence establishing the cause of action. In order to be founded upon an instrument in writing the instrument must, itself, contain a contract to do the thing for the nonperformance of which the action is brought." The last sentence of the quotation, in and of itself, if given a literal application would without doubt support respondent's contention here; but the court in its opinion also uses the following very significant language, quoting from the case of *Chipman* v. *Morrill*, 20 Cal. 132, which indicates that it did not intend to have it so applied: "In the case at bar the contract—if any such there be—of the appellant to pay respondent for services is not the direct and immediate consequence of the resolution appointing him superintendent. Respondent, being a director of appellant, was not entitled to compensation for services rendered the corporation, *unless the circumstances were such as to raise an implied assumpsit* to pay what they were reasonably worth. But that *assumpsit* did not arise out of the mere fact of his appointment as superintendent, as might have been the case, perhaps, if he had been a stranger. In *Scrivner* v. *Woodward*, 139 Cal. 314 [73 Pac. 863], which was an action for the breach of an oral contract to cancel and return a note and bonds given as collateral security therefor, the court at page 316 says: "Promises merely implied by law, and not supported by any express promise or stipulation in the written instrument, do not fall within the provision of section 337 relative to contracts in writing. This was held in *Thomas* v. *Pacific Beach Co.*, 115 Cal. 136 [46 Pac. 899], and is well settled law. . . . The receipt involved in the case of *Ashley* v. *Vischer*, 24 Cal. 322 [85 Am. Dec. 65], contained language which was properly construed as an express promise, and if anything was said therein intimating that as to any obligation not expressed therein, but only implied by the law therefrom, the four-year section would be applicable, it must be disregarded as being in conflict with the later decision of this court."

An interesting case is that of *O'Brien* v. *King*, 174 Cal. 769 [164 Pac. 631], which grew out of a loan of money evidenced by the following writing: "Received from Miss Hannah O'Brien, on June 21st, 1911, $450 (Four Hundred and Fifty Dollars) in U. S. Gold coin, at 5 per cent interest." The question principally discussed in the opinion, and con-

cerning which the court had some doubt at the time the petition was granted for hearing in the Supreme Court after decision of the District Court of Appeal, was "the validity of the defendant's plea of the statute of limitations". The trial court expressly found that the cause of action was not barred by the statute, which defendant contended was error. The Supreme Court in affirming the judgment of the trial court laid down the rule that "a cause of action is founded upon an instrument of writing when the contract, obligation or liability grows 'out of written instruments not remotely or ultimately, but immediately'", citing *Chipman* v. *Morrill*, from which it quoted: *Ashley* v. *Vischer, supra, Louvall* v. *Gridley*, 70 Cal. 507 [11 Pac. 777], *Lattin* v. *Gillette*, 95 Cal. 317 [29 Am. St. Rep. 115, 30 Pac. 545], *McCarthy* v. *Mt. Tecarte L. & W. Co., supra, Thomas* v. *Pacific Beach Co., supra*, and *Scrivner* v. *Woodward, supra*. The court then quotes the language which we have quoted herein from the case of *McCarthy* v. *Mt. Tecarte L. & W. Co.*, including the last sentence thereof, and after discussing the case of *Ashley* v. *Vischer* and showing that in that controversy, so far as the first instrument relied on was concerned, the holding was that it was a mere receipt for the amount of money specified, and neither expressed nor imported any obligation to pay, says, the italics being ours: "It was pointed out that 'the presumption of law is that money, when paid, is in liquidation of an antecedent debt'. . . . The writing in the present case is more than the mere receipt embodied in the first paper under consideration in *Ashley* v. *Vischer*. . . . The words 'at 5% interest' import into the writing an additional and significant element. The paper is not a mere declaration that money has been received by the defendant from the plaintiff. It embodies the statement that it has been received at a given rate of interest. The reasonable—indeed, the only reasonable—meaning of these words is that the money was received as a loan at a specified interest rate. A loan being established by the writing, a promise to repay is implied by necessary inference of law and fact. Such promise is embodied in the language of the writing, although not expressed in the words 'I promise to pay, . . . None of the cases decided in this state, and cited above, will be found in conflict with this view. They all had to do with writings which did not, in and of themselves,

express the obligation sued upon, *or a state of facts from which such obligation necessarily and directly flowed.* In each instance the obligation could be established only by evidence of facts and occurrences outside of those appearing on the face of the instrument. A situation of this kind was in the mind of the court when it said, in *Scrivner* v. *Woodward,* 139 Cal. 314 [73 Pac. 863]," the court then quoting the words we have quoted hereinbefore from that case, with its statement regarding the case of *Ashley* v. *Vischer.* The opinion then proceeds: "We adhere to the declaration that promises 'merely implied by law' from a situation evidenced by a writing, i. e., *quasi* contracts, are not within the statutory provision under discussion. The promise must be one arising directly from the writing itself, and included in its terms. But in determining whether the obligation is 'supported by an express promise or stipulation in the written instrument', we must regard, as included in the terms of the writing, all obligations and promises which its words necessarily import." As if to settle any question about the rule laid down and prevent any possible misapplication of the language used in *McCarthy* v. *Mt. Tecarte L. & W. Co.* and *Scrivner* v. *Woodward, supra,* the court goes on to say: "The distinction which we have tried to point out is well stated in *Long* v. *Straus,* 107 Ind. 94 [57 Am. Rep. 87, 6 N. E. 123, 7 N. E. 763], where the court upon a rehearing discussed the question exhaustively. The following language from the opinion in that case is in point here: 'Where there is an express contract there can be no implied one. An express written contract contains the only competent evidence of the agreement of the parties. There is here an express written contract, and, therefore, there is no implied one. But this written contract is to be given legal effect, and to give it effect the courts must consider it as embodying all the legal obligations implied from its language. These obligations, we repeat, are part of the written contract. The law imported into the contract does not create an independent agreement, but makes the instrument express the full agreement of the parties. . . . Into the contract before us the law enters and makes it an agreement to repay the money received on deposit. . . . Our conclusion reaches further than that there is an implied promise to pay the depositor his money, for it goes to the extent of affirm-

ing that this promise is created by law as an element of the contract, and as such enters into and forms a part of the written argeement. We do not regard the promise as an independent one, existing outside of the written contract, but as a promise forming one of the terms of the contract.' ''

The writing in the O'Brien case disclosed a loan transaction. The law implied as an existing part of the written agreement a promise to repay the money, and the cause of action being based on a written agrecment, i. e., a provision of it necessarily and directly implied by law, the agreement to repay was held to be within subdivision 1 of section 337, and not subdivision 1 of section 339 of the Code of Civil Procedure. As in our opinion the writings involved here, given the inferences favorable to plaintiff, may be said to create a written contract of employment between . appellant and respondent, the law steps in and necessarily directly implies a promise by respondent, as a part thereof, to pay for the services rendered thereunder. Such an agreement, under the rule of the O'Brien case, as well as the cause of action based thereon, seems to be within the meaning of subdivision 1 of section 337 and so was not barred at the time the complaint was filed. In our opinion, therefore, the case should have been determined on the merits and the motion for nonsuit should not have been granted.

Judgment and order reversed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 1, 1931, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 4, 1931.