[Civ. No. 19102. First Dist., Div. One. Aug. 26, 1960.]

MARTHA JANE LICH, Appellant, v. MABEL RUTH CARLIN, Respondent.

Frederick S. Reinheimer for Appellant.

Raymond H. Goodrich and Joseph C. Davish for Respondent.

QUAYLE, J. pro tem.*—This is an appeal from a nonsuit in favor of the defendant Mabel Ruth Carlin. The plaintiff brought suit to enforce an agreement alleged to have been entered into by her mother Elsie Carlin and her stepfather John Carlin, whereby each would leave to the other all property owned at death and the survivor would leave all of said property remaining at his or her death to plaintiff, Martha Jane Lich. Elsie died first and John Carlin remarried. Defendant Mabel Ruth Carlin became his wife. He executed a will in her favor and she succeeded to all of his property, either under his will or as surviving joint tenant. This action seeks to establish a trust in and to any property of John Carlin now held by defendant.

---

*Assigned by Chairman of Judicial Council.

## FACTS

Elsie Moltz married John Carlin in May 1936. John Carlin had no children. Plaintiff, Martha Jane, was Elsie's daughter from her previous marriage to Marcus Moltz. The plaintiff, Martha Jane, married Donald Lich and the couple had three daughters. In July 1957 the plaintiff moved from Pasadena to Santa Cruz in order to take care of her mother Elsie, who was suffering from cancer. The plaintiff's family rented a home a few blocks from the Carlin residence. The plaintiff spent a substantial portion of each day in the Carlin home taking care of her bedridden mother.

Some time in July or August 1957 Elsie showed plaintiff documents in Elsie's handwriting bearing the signatures of Elsie and John Carlin. They provided for mutual testamentary disposition of the Carlin property: all to the surviving spouse and upon the death of the survivor, one-half to plaintiff, one-quarter to a church, and one-quarter to Elsie's brother, Monty Stuckey.

A short time thereafter Elsie was seen writing two documents which were later shown to plaintiff. They appeared to be wills, in form, and they were entirely written and dated in Elsie's handwriting but at that time they contained no signatures. Several days later plaintiff and her husband discussed these wills with Elsie and John in Elsie's bedroom. Elsie stated, in John's presence, that she was leaving everything to John because of his condition, and that he agreed to do the same for her in case he died first, and that afterwards when they were both gone everything left in their estates would come to plaintiff and her daughters. The language of these wills substantially carried out this testamentary plan. Elsie and John had affixed their signatures to their respective wills at this time but no witnesses had signed them.

A few days later John Carlin arranged to have Herbert Flores and his wife Pearl Flores come to the home and sign as witnesses to these new wills. Elsie explained the wills to Mr. and Mrs. Flores in John's presence. Both she and John stated that the signatures thereon were theirs. Since Elsie was bedridden the wills were taken into the adjoining kitchen, approximately 10 feet from Elsie's bed, where the witnesses signed both documents in John's presence.

The following evening John Carlin took the wills out of a drawer and discussed their contents with Mr. and Mrs. Lich. He stated that he would carry out his wife's wishes as he had

promised and that plaintiff would eventually get the Carlin property.

A few weeks later, on October 21, 1957, Elsie Carlin died. Plaintiff and her husband did not move back to Pasadena until early in November 1957. However, both testified that they saw the wills in question in a drawer in the Carlin home after Elsie's death and prior to their moving away. On or about November 26, 1957, John Carlin wrote to one Alvin Grauerholz, attorney for plaintiff's grandmother, and admitted that ''She [Martha] has already been compensated from Elsie's will to some extent.''

But no will of Elsie Carlin was ever produced or probated. The only property on which her name appeared stood in joint tenancy with her husband. He succeeded to this as surviving joint tenant through the recordation of a certified copy of Elsie's death certificate. On November 29, 1957, John applied for a marriage license to wed Mabel Ruth Kissinger, the defendant herein. The ceremony was performed on December 20, 1957. On January 8, 1958, he executed a will leaving all of his property to defendant. He died on July 17, 1958, and his will was filed for probate on August 15, 1958. Most of his property stood in joint tenancy with defendant and she succeeded to it as surviving joint tenant.

Plaintiff learned about John Carlin's death indirectly and not from defendant. She then wrote to defendant inquiring about Elsie's and John's wills. Defendant's letter in reply stated ''. . . combined will of your mother and Johnny, no such one was found . . . we combined everything into joint tenancy, which precludes court action.''

Plaintiff then filed ''Complaint to Establish a Trust, for Specific Performance, to Quiet Title and For Declaratory Relief.'' In it were listed assets now possessed by or standing in the name of defendant which were owned by the Carlins prior to Elsie's death or the proceeds or reinvestments from the same.

## Issues

Since this is an appeal from a judgment of nonsuit the main issue is whether or not there is sufficient evidence to support a triable issue of fact. It is only when there is no evidence to prove an essential element of a cause of action that a nonsuit is proper. *Stewart* v. *Miranda,* 170 Cal.App.2d 373 [338 P.2d 941]; *Brady* v. *Carman,* 179 Cal.App.2d 63 [3 Cal. Rptr. 612]; *Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124].

The motion for nonsuit was made and granted on the ground that there was no enforceable agreement between Elsie and John Carlin that would affect the disposition of this property. Defendant contends that the nonsuit was proper because:

(1) There was no evidence that the parties entered into a contract;

(2) The terms of the alleged contract were uncertain;

(3) Elsie Carlin revoked her will prior to her death;

(4) Plaintiff cannot enforce the alleged contract;

(5) An action to enforce disposition of property according to mutual wills cannot affect property standing in joint tenancy.

### Was There Evidence That the Parties Entered into a Contract?

The fact that Elsie and John executed wills at approximately the same time, or that wills provided reciprocal benefits to the makers and the same eventual distribution, raises no inference that they are mutual wills, or that they were executed pursuant to contract. ▮ The making of mutual reciprocal wills, standing alone, is not evidence of an agreement to make such wills. (*Daniels* v. *Bridges*, 123 Cal.App.2d 585 [267 P.2d 343].) Neither are declarations of testamentary intentions sufficient to constitute a contract to make a will. (*Berdan* v. *Berdan*, 39 Cal.App.2d 478 [103 P.2d 622].) There must be an agreement between the parties themselves. (Civ. Code, § 1565.) Therefore we must determine whether the evidence indicated that Elsie and John agreed between themselves as to the testamentary plan alleged.

▮ Four witnesses testified on this subject. Herbert Flores came to the Carlin home with his wife to act as witnesses on the wills. He recalled very little of the conversation, but he did testify that John told him that they had agreed to wills that they wanted witnessed. On the same evening, his wife Pearl Flores heard Elsie say, in John's presence, "I have Johnny's and my Wills and we have agreed that in these Wills in the event I die first my worldly goods will go to Johnny, and then if Johnny should pass away it would be Martha's and her children[']s." She also heard Elsie say that if Johnny should die first the property would be hers and then it would be Martha's and the children's when she passed away.

Plaintiff's husband, Donald Lich, testified that he saw and

read the wills in question; that he was in the kitchen when Mr. and Mrs. Flores placed their names on the documents as witnesses thereto; that on the following evening John brought out the wills and discussed them with Lich and his wife. He heard John tell plaintiff not to feel bad because she would get nothing from her mother's will if Elsie died first, because he intended to carry out Elsie's wishes if he outlived her. In that case when he died anything that was left would go to plaintiff and her children.

Plaintiff herself testified that in July or August, 1957, her mother Elsie showed her two documents that set forth a testamentary plan for Elsie and John. They provided for distribution of the Carlin property to the surviving spouse and upon the death of the survivor, it would go one-half to plaintiff, one-quarter to a church, and one-quarter to Elsie's brother, Monty Stuckey. Shortly thereafter she saw Elsie prepare two new testamentary documents in longhand. Plaintiff read them and discussed them with Elsie. One was a will for Elsie giving everything to John if living, and if he be dead, then everything to Martha or her children. The other was a will for John giving everything to Elsie if living, and if she be dead, then everything to Martha or her children. About September 1, 1957, Elsie told her, in the presence of John and Donald Lich, that she was leaving everything to John because of his heart condition, and that he agreed to do the same for her if he died first. That afterwards when they were both gone everything left in their estates would go to plaintiff or her daughters. She corroborated the testimony of Mr. and Mrs. Flores as to what took place when the wills were witnessed and corroborated her husband's testimony about John assuring her that she and the children would eventually get the property.

The evidence of these four witnesses would support a finding that between September 1 and 15, 1957, Elsie executed a holographic will disposing of her property in the manner alleged by plaintiff. Whether or not her will was properly witnessed would therefore be immaterial. The evidence did indicate that John's will was properly witnessed.

The evidence was sufficient to raise a triable issue of fact whether or not Elsie Carlin and John Carlin entered into an agreement for the mutual disposition of their property, and executed their wills for the purpose of carrying out that contract.

## WERE THE TERMS OF THE ALLEGED CONTRACT UNCERTAIN?

Defendant contends that even if the evidence shows an agreement for testamentary disposition of the Carlin property, it is unenforceable because there is no clear and convincing evidence from which to establish its terms, nor to establish the property affected by it. ▮ No agreement can be enforced unless its terms are sufficiently certain as to enable a court of equity to carry out the intent of the contracting parties. (*Russell* v. *Agar*, 121 Cal. 396 [53 P. 926, 66 Am.St.Rep. 35].) ▮▮ Unless it can be determined to whom the property was to go, and in what proportions, the agreement is too indefinite to be specifically enforced. (*Harris* v. *Larter*, 36 Cal.App.2d 587 [97 P.2d 1035].)

▮ It is claimed that an uncertainty arises because the alleged agreement provided that upon the death of the surviving spouse the property remaining would go "to Martha or her children," or "to Martha and her children," or "to Martha and Don," or "to Martha and to the children if she passes away." Each one of these phrases was mentioned by one witness or the other. But this conflict does not mean that the agreement is necessarily uncertain as to the intended disposition as between Martha and/or others. Some witnesses paid less attention to these details than others. Some relied on what was said and did not read the wills involved. Others heard it discussed and read the documents. It is for the court to weigh and consider these circumstances and resolve the conflict if possible. It cannot be said that as a matter of law this circumstance makes the contract uncertain.

▮ As to defendant's claim that the property affected by the contract cannot be ascertained, it appears that plaintiff's complaint sets forth specific items of property which are now held by defendant. The record indicates that the property was owned by Elsie and John on October 21, 1957, or represents proceeds or reinvestments thereof. If evidence to the contrary is adduced, it will be up to the trier of fact to resolve that question one way or the other. The statements of Elsie and John, together with the evidence as to what their wills contained, indicate that the property affected by the alleged agreement would be that which they owned on October 21, 1957, when Elsie died, and which remained on hand when John died. This has been held to include the proceeds of any such property as may have been liquidated and also the traceable reinvestments thereof. Equity will enforce a constructive trust on the property. (*Daniels* v. *Bridges, supra,* at p. 589.)

## WAS THERE EVIDENCE THAT ELSIE'S WILL REMAINED UNREVOKED AT HER DEATH?

The will of Elsie Carlin was never produced or offered for probate after her death. Defendant claims that since the document was in Elsie's possession and was never produced or probated after her death it is presumed to have been destroyed by her with intent to revoke. If there were no evidence that the document was in existence after Elsie's death, that presumption might prevail. (*Estate of Ross,* 199 Cal. 641 [250 P. 676].) But the record here reveals that a few days after his wife's death John wrote a letter in which he states, "She [Martha] has already been compensated from Elsie's will to some extent." This constitutes an admission by John that Elsie left a will. This can be considered as an admission against defendant because her rights are derived from those of John.

Both Martha and Donald Lich testified that they saw the wills in question in a drawer in the Carlin home after Elsie's death and prior to their leaving Santa Cruz in November, 1957. Defendant contends that this testimony has no value since, in their depositions, both of these witnesses stated they never saw the wills after Elsie died. This point has no merit here because we are considering a motion for nonsuit where the court must assume that all relevant evidence in favor of the plaintiff is true and must resolve all reasonable inferences and doubts in favor of the plaintiff. (*Lasry* v. *Lederman,* 147 Cal.App.2d 480, 488 [305 P.2d 663].)

### CAN PLAINTIFF ENFORCE THE ALLEGED CONTRACT?

Defendant questions plaintiff's right to maintain this action. Since there was no consideration on her part and since she was not a party to the contract, plaintiff can only bring this action as a third party beneficiary. The alleged oral contract is performable only after the death of both principals to it; therefore, plaintiff is confronted with the problem of getting around the Statute of Frauds.

*Brown* v. *Superior Court,* 34 Cal.2d 559 [212 P.2d 878], dealt with these problems. At page 564 the court states: ". . . Where two parties agree to make mutual wills, each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. The contracting party

who survives becomes estopped from making any other or different disposition of the property, and his obligations under the agreement become absolutely irrevocable and enforceable against him, at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder.''

*Fuller* v. *Nelle,* 12 Cal.App.2d 576 [55 P.2d 1248], also has many features that resemble the case at bar. There Fuller and his wife made testamentary dispositions by will pursuant to an agreement between them. After Fuller died, his wife revoked her will and executed a new one. The beneficiaries under the first will contested the later will and sought to establish a trust in their favor against the property in her estate. In granting the relief prayed, the court pointed out that Mrs. Fuller said nothing while her husband, in her presence, was telling the witnesses about the agreement and stated, *supra,* page 579, ''. . . I can depend upon my wife to carry out our mutual wishes . . .'' Express agreement by the parties not to revoke is unnecessary. Such intention can be implied. The property having passed to Mrs. Fuller under her husband's will, she, or her successors, were estopped from pleading the Statute of Frauds and were obliged to carry out the agreement which found expression in her first will.

### Does Contract to Enforce Terms of Mutual Wills Affect Property Standing In Joint Tenancy?

Finally defendant points out that the only evidence of an agreement refers to the making of mutual wills. Except for certain personal effects and furniture none of Elsie's property would pass by will because it stood in joint tenancy with John. Upon her death any interest that she had in the property would terminate and John would automatically own it all.

Hence, nothing having passed to John by virtue of Elsie's will, the rules expressed in *Brown* v. *Superior Court, supra,* and *Fuller* v. *Nelle, supra,* would not apply in this case.

Oral evidence is admissible to show that property held in joint tenancy is in fact community property, and subject to the control of the spouses as such. (*Tomaier* v. *Tomaier,* 23 Cal.2d 754, 757 [146 P.2d 905] ; *Sears* v. *Rule,* 27 Cal.2d 131, 142 [163 P.2d 443] ; *Socol* v. *King,* 36 Cal.2d 342, 345 [223 P.2d 627].) The record here shows that the property in question was accumulated by the Carlins during their married life. The pretrial order set forth that ''. . . except for inheritances, all of the estate was the result of

their community efforts.'' Only a small part of the property owned by the Carlins on October 21, 1957, was received by way of inheritance. Therefore, Elsie was entitled, if she so desired, to convey her half of the community property as she pleased or to terminate the joint tenancy in her lifetime and give her share of it to whomever she pleased by her will. If, instead of doing this, she executed a will as alleged by plaintiff, did not revoke it during her lifetime, and desisted from terminating the joint tenancy because she relied upon her husband to carry out his part of the testamentary agreement, there is sufficient consideration on Elsie's part to make the contract binding upon John thereafter.

In *Van Houten* v. *Whitaker*, 169 Cal.App.2d 510 [337 P.2d 900], the surviving spouse did not probate decedent's will. He claimed all her property as surviving joint tenant. However, the court looked to the true nature of the property and the intent of the parties and enforced an oral agreement to devise in a certain manner upon the death of the surviving spouse. Agreements such as alleged by plaintiff do affect property held in joint tenancy if that is the intent of the contracting parties. (*Socol* v. *King, supra,* and *Sears* v. *Rule, supra.*) Therefore, the evidence in this case is sufficient to require that the finder of fact determine whether or not such a situation did actually exist here.

The judgment of nonsuit is reversed.

DUNIWAY, J.—I concur but I do so with the greatest reluctance. My reluctance is based upon the fact that this case is, to me, another illustration of the utter absurdity of the present California rule regarding the granting of a nonsuit in an action which is tried by the court without a jury. At the conclusion of the argument on the nonsuit, Judge Perry made an oral summing up of the testimony which occupies some eight pages of the transcript. In it he indicated very clearly his conviction that the evidence, offered on behalf of the plaintiff, was not substantial and that some of it, particularly the testimony of the plaintiff and her husband that they did see Elsie's will after her death, which was flatly contrary to the testimony they had given on their depositions, was unworthy of belief. A careful review of the transcript leads me to the same conclusion. Nevertheless, by reason of the present rule regarding the granting of a nonsuit by the court, this court is compelled to reverse the judgment and send the case back for another trial. The decision turns upon the form of words used

by counsel and the court, and not at all upon the question whether the court was basically right in its views as to the sufficiency and credibility of the evidence. This is the type of rule which justifies the frequent lay criticism of the overtechnicality of the courts and of rules of legal procedure.

The defects in the present rule were ably and fully outlined by Mr. Presiding Justice Shinn in the case of *Lasry* v. *Lederman,* 147 Cal.App.2d 480 at pages 488-490 [305 P.2d 663], and there is little I can add to his criticism of the rule. Mr. Justice Draper, in *Stewart* v. *Miranda,* 170 Cal.App.2d 373 [338 P.2d 941], expresses his concurrence with the views of Mr. Presiding Justice Shinn in the Lasry case. See also Mr. Presiding Justice Shinn's comments in *White* v. *Shultis,* 177 Cal.App.2d 641, 646 [2 Cal.Rptr. 414]. The present rule is judge made. Having been made by judges, it can be changed by them. However, in view of the many cases in which the Supreme Court has reaffirmed the rule, this court is in no position to change it.

I suggest, however, that the rule stated in Federal Rules of Civil Procedure, rule 41(b), is a far more sensible and practical rule. That rule provides: ''After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits.'' This provision gives full effect to the fact that in a nonjury case, the court is the judge as to the credibility of witnesses, and permits him to dispose of the case on the merits at the conclusion of the plaintiff's case whenever he determines, on the merits, that the evidence is insufficient.

It may be said that under the California rule the defendant can protect himself against its operation by not moving for a nonsuit but, instead, submitting the case without offering any evidence, following which the court can decide the case in his

favor on the merits. This is playing games. Such a procedure, moreover, can be a trap, as counsel may not be in any position to know, without first having made a motion for a nonsuit, what the judge's views are as to the sufficiency of the evidence, and he may find himself in the embarrassing position of having lost his case when, if he had produced evidence to contradict that of the plaintiff, he would have won it. The federal rule does not force a defendant into this kind of Hobson's choice. Based upon personal experience, I am convinced that the federal rule has saved a good deal of time and useless effort on the part of both trial and appellate courts in the federal system. The adoption of a similar procedure in California either by our Supreme Court, which has the undoubted authority to change the present rule, or, by the Legislature, if the Supreme Court is unwilling to act, would have the same beneficial effect.

At the oral argument counsel for respondent suggested that under the circumstances of this case the court should apply section 4½ of article VI of the Constitution and determine that the error of Judge Perry in granting a nonsuit has not resulted in a miscarriage of justice. That section is limited to cases involving misdirection of the jury, and improper admission or rejection of evidence, error as to a matter of pleading, or error as to a matter of procedure. The only one of these categories under which the present case could be said to fall is that of an error of procedure, and it is certainly arguable that that is what is here involved. If Judge Perry, instead of granting the nonsuit, had indicated to the defendant's counsel that he would grant a judgment on the merits without hearing further evidence, and defendant's counsel had then submitted the matter on the merits, and Judge Perry had then proceeded to decide the case on the merits, making findings of fact against the appellant, that judgment would be unassailable on this record. It is certainly arguable that the difference between what Judge Perry did and what he could have done is solely a difference in procedure and that the error, therefore, is an error of procedure. And it is apparent that it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].)

I have been able to find no case in which section 4½ of article VI has been invoked by counsel on an appeal from an order granting a nonsuit in a case tried by the court without

a jury; so it can be argued that the question is an open one in this state. However, section 4½ has been in the Constitution since October 10, 1911. Since that time the Supreme Court has twice held and the District Court of Appeal has nine times held[1] that a judgment should be reversed when based upon the granting of a nonsuit in a case tried by the court without a jury where there is any evidence that would support a judgment for the plaintiff. No doubt there have been numerous cases in which the same rule has been applied and judgment has been reversed without discussion of the fact that the same rule has been held applicable in such cases as in cases where there was a jury. Examples are cited in the margin.[2]

Under these circumstances, I do not feel that it would be proper for this intermediate appellate court to affirm the judgment in reliance upon section 4½ of article VI of the Constitution in this case, although I believe that such decision would be correct. The contrary rule has so often been applied that it seems to me that only the Supreme Court could properly so hold today.

Tobriner, Acting P. J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 19, 1960. McComb, J., was of the opinion that the petition should be granted.

---

[1]*Grummet* v. *Fresno Glazed Cement Pipe Co.* (1919), 181 Cal. 509 [185 P. 388]; *Szopieray* v. *West Berkeley etc. Co.* (1924), 194 Cal. 106 [227 P. 720]; *Wilson* v. *Wallace* (1931), 113 Cal.App. 278 [298 P. 86]; *Biurrun* v. *Elizalde* (1923), 61 Cal.App. 675 [215 P. 690]; *Hale* v. *Safeway Stores, Inc.* (1954), 129 Cal.App.2d 124 [276 P.2d 118]; *Cullen* v. *Spremo* (1956), 142 Cal.App.2d 225 [298 P.2d 579]; *Lasry* v. *Lederman* (1957), 147 Cal.App.2d 480 [305 P.2d 663]; *Bunch* v. *Henderson* (1959), 167 Cal.App.2d 112 [333 P.2d 813]; *White* v. *Shultis* (1960), 177 Cal. App.2d 641 [2 Cal.Rptr. 414]; *Stewart* v. *Miranda* (1959), 170 Cal.App. 2d 373 [338 P.2d 941]; *City of Santa Cruz* v. *MacGregor* (1960), 178 Cal.App.2d 45 [2 Cal.Rptr. 727].

[2]*Perkins* v. *Maiden* (1940), 41 Cal.App.2d 243 [106 P.2d 232] (nonjury —ques. not considered); *Singleton* v. *Singleton* (1945), 68 Cal.App.2d 681, 699 [157 P.2d 886]; *Croslin* v. *Scott* (1957), 154 Cal.App.2d 767 [316 P.2d 755].