William R. ROBISON; Kathy Denise
Paradies; and William Lee Robison
and Kathryn Robison, Appellees,

v.

Randle GRAHAM, Administrator of the
Estate of William Clyde Graham, De-
ceased, and Stella E. Graham, Graydon
Berry, and Bobby L. Berry, Appellants.

Nos. 66423, 66096.

Supreme Court of Oklahoma.

Sept. 25, 1990.

As Corrected Oct. 1, 1990.

Rehearing Denied Oct. 30, 1990.

Philip F. Horning, Carrie S. Hulett and
R. Lyle Clemens, Horning, Johnson Grove

Moore Hulett & Thompson, Oklahoma City, for appellees.

Gerald E. Durbin, II, J. John Hagar, Jr., Durbin, Larimore & Bialick, Oklahoma City, for appellants.

LAVENDER, Justice.

The principal issue presented is whether Oklahoma will enforce a mutual and conjoint will where the will contained a written contract, the surviving spouse probated and accepted benefits under the will and the contract was thereafter breached. We answer in the affirmative.

## I. FACTS

Mary Kay Graham ("Mary"), deceased, and William Clyde Graham ("Clyde"), deceased, both of Windsor County, Missouri, were married in 1942. They were married for thirty-seven years. Mary had one daughter by a previous marriage. On March 3, 1973 Mary and Clyde executed a mutual and conjoint will. A *written contract was contained in the will.* The pertinent parts of the will are as follows:

> *We* do hereby *jointly and severally* declare that the provisions hereinafter made for the disposition of the property *owned by each of us and jointly by us, are the result of a contract and agreement between us, that the provisions made for each of us are induced by the provisions made by the other, and that the provisions made for each of us are the consideration for the provisions made by the other.  We do further declare, each for herself and himself, that neither of us would have made the provisions herein contained for the other, but for the other making the provisions contained herein for him or her; and each of us in consideration of the premises, and for the reciprocal promises and agreements made by the other, do hereby agree not to revoke, alter, or amend this will except that prior to the death of either of us, this will may be changed, cancelled, annulled, or amended by another will or codicil to this will, duly executed by both of us.*
>
> . . . .

> At the death of the first of us, the first of us to die does hereby give, devise and bequeath to the survivor, all of our property wheresoever situated, which the first of us to die may own at the time of his or her death, or to which he or she may thereafter become entitled ... *[u]pon the death of the last of us, we give, devise, and bequeath one-half of all of the rest, residue and remainder of our estate, wheresoever situated, which the survivor of us may own at the time of our death, or to which he or she may thereafter become entitled,* to Kathryn E. Robison and William R. Robison, or the survivor, to be theirs absolutely.
>
> . . . .

> *Also, upon the death of the last of us, we give, devise, and bequeath the remaining one-half of our residuary estate* to Karl Kroenke, to be held IN TRUST by him for William Lee Robison and Kathy Denise Bratcher.

The will was not revoked prior to Mary's death on April 16, 1979. Thereafter, Clyde presented the mutual and conjoint will for probate and it was admitted by the Circuit Court of Henry County, Missouri as Mary's last will and testament. The Missouri attorney that had drawn up the will advised Clyde at Mary's death that he could defeat the terms of the will by taking his intestate share as the surviving spouse rather than under the will. However, Clyde chose not to do so and took his share of the estate pursuant to the terms of will.

Clyde later moved to Oklahoma and married Stella E. Berry ("Stella") in May, 1981. The marriage lasted almost four years, until Clyde's death in 1985. During their married life, Clyde lived in Stella's home. The home was paid for and Stella retained it as separate property; as such, Clyde never paid for living there, though he did pay for considerable improvements to the property. Most of Clyde's estate was then in certificates of deposit. As these certificates matured, he had them placed in joint tenancy with Stella. The interest from these certificates went into their joint bank account, as did their retirement and social

security checks. Whenever there was an excess of funds in the account, additional certificates of deposit were purchased.

Prior to this second marriage, and contrary to the terms of the .contractual will, Clyde had a new will drawn up revoking the previous one. After he and Stella were married, Clyde had three subsequent wills prepared for him, the last one was presented for probate as Clyde's last will and testament. Under this will, Clyde did leave Mary's daughter a substantial devise, ($50,-000) however, it was not, as according to the contractual will, one-half of his entire estate, nor did Clyde leave the remaining one-half of the estate to Mary's grandchildren pursuant to the will. Stella was to receive the remainder of the estate under the will.

After Clyde's death, Appellees brought an action in district court seeking the imposition of a constructive trust on Clyde's estate and for an accounting of the property. The trial court determined that Clyde's actions following Mary's death were unconscionable and constituted a breach of the contractual will, and that a constructive trust should be imposed on Clyde's entire estate subject to Stella's proof of any marital assets that were her's. In a later hearing, the trial court allowed Stella $28,-809.43 as set-off against the judgment.

The Court of Appeals reversed the trial court, finding there was no evidence that Clyde's actions were unconscionable or fraudulent. As there were no restrictions in the will concerning what Clyde could do with the property during his lifetime, the court held that the estate was Clyde's to do with as he pleased. Moreover, the court noted that since the property had been held in joint tenancy with Mary, the property passed by right of survivorship, therefore, there was nothing that Clyde actually took by way of the will. Finally, the court. determined that under the contractual will, Appellees were to have received only one-half of the estate [1] and they had received this amount, fifty thousand dollars ($50,-000) or one-half of the hundred thousand dollars ($100,000) as valued at Mary's death,[2] under Clyde's later will. Appellees petitioned for certiorari which was granted.

## II. WAS THERE A BINDING WRITTEN CONTRACT AND WILL THIS COURT ENFORCE IT.

Over the years, this court has considered a number of cases wherein a party was claiming a will was contractual. Some of those decisions may appear divergent in nature. However, a careful study reveals distinguishing factors and while it is not necessary to review all of them, a few merit discussion.

*Lyons v. Luster* [3] stated the general rule of law that, "[a]n oral or written contract to make a will may be enforced in Oklahoma." This is especially true where the joint will is probated and the survivor accepts the benefits.[4] In *Coffey v. Price,*[5]

---

1. The Court of Appeals erred in so holding however, since the terms of the will went on to state that the *remaining* one-half of the residuary estate was to be devised and held in trust for Mary's grandchildren. It was the *entire* estate therefore, that made up the testamentary disposition.

2. However, the contractual will clearly stated that the remainder to be devised was to include "all of the rest, residue and remainder of our estate, wheresoever situated, which the survivor of us may own at the time of our death, *or to which he or she may thereafter become entitled* ...." It was the entire estate *as valued at Clyde's death* therefore, that was to be devised.

3. 359 P.2d 567, 569 (Okla.1960).

4. In the case of *Cook et al. v. Hahn et al.,* 198 Okla. 364, 178 P.2d 894 (1947), this court held: "A petition which alleges the execution of a joint will pursuant to the terms of a contract and the

acceptance of benefits thereunder by the survivor, states a cause of action in favor of the residuary legatees therein as against the devisees in a will subsequently executed by such survivor, and is not subject to demurrer." *See also Foulds v. First Nat. Bank,* 103 N.M. 361, 363, 707 P.2d 1171, 1173 (1985), citing *Brown v. Brown,* 53 N.M. 379, 208 P.2d 1081 (1949), "A contractual will is binding on a survivor when the survivor accepts the benefits provided thereunder."; *In Re Estate of Chayka,* 47 Wis.2d 102, 106, 176 N.W.2d 561, 563–64 (1970), "Such contract becomes partially executed upon the death of one of the parties to the agreement and acceptance by the survivor of properties devised or bequeathed under the will and pursuant to the agreement to make such joint will. At this point the contract becomes irrevocable, the survivor having received the consideration promised." (citiations omitted.)

5. 380 P.2d 537 (Okla.1963).

this court further stated that in order to find a contractual and irrevocable agreement between the parties it was necessary to have such specific language as "it being our desire to jointly dispose of our property in accordance with an agreement reached between us, we, ... do hereby make, publish and declare this .to be our joint and mutual and irrevocable will and we hereby declare it to be contractual." [6] However, the court declared that, "[t]he law is well settled in this jurisdiction that any person executing a conjoint or mutual will with another does so with notice given by 84 O.S.1961, § 52 that such will may be revoked by any of the testators in like manner with any other will." [7] Therefore, the court held that, *if it is the testator's intent to "attribute to [a] joint [and or mutual] will the quality of irrevocability,* the burden is upon the beneficiaries claiming thereunder *to make affirmative proof of the existence of contract, either by indisputable evidence, or by terms of the will itself."* [8]

In the present case, proof of a mutually binding contract to devise property was within the four corners of the will executed by Clyde and Mary as evidenced by the underlined language in the prior quoted sections. The language is probably more definitive than that described in *Coffey* and clearly expresses the intent of Clyde and Mary to make a binding and irrevocable contract concerning the disposition of their property. The will stated that they were to leave their respective separate, joint and after acquired property to each other, and that upon the last one's death, one-half of the remainder of their estate was to be given to Mary's daughter and her husband and the remaining one-half to the daughter's children. Clyde offered Mary's will for probate and took the estate subject to its terms. Significantly, Clyde's share was

greater than what he would have received had he not taken under the will. [9]

■ There is also the evidence of the Missouri attorney who drafted the will. Appellants contend that it was reversible error to admit the attorney's testimony in that it violated the parol evidence rule and was not relevant. We disagree. From the language of the will, Appellees proved there was a contract to make a testamentary disposition and that it was not to be revoked, altered, or amended except prior to the first one's death. However, Appellees also had to sustain their burden of proof as to the constructive trust and parol evidence may be used to prove the establishment of a constructive trust. [10] In this respect, not only was the attorney's testimony consistent with the terms and intent of the written contract, it moreover supported the imposition of a constructive trust.

The attorney testified that he explained to Clyde and Mary prior to their signing the will what, in his opinion, the survivor could or could not do with the estate. He told them that they could use the estate, or the entire estate, so long as their actions were not done to defeat the terms of the will and that to put the estate in joint tenancy with another would be such an action. Again, after Mary's death, he informed Clyde that he could yet defeat the terms of the will by taking his intestate share and not probating the will. However, Clyde chose not to do.

Appellants contended and the Court of Appeals agreed, that since the will did not contain any written restrictions, Clyde, during his lifetime, could do with the property as he pleased, even give it away. Further, since much of the property was owned in joint tenancy by Clyde and Mary when she died, Clyde owned his share of this property outright by way of survivorship and

---

6. *Coffey*, 380 P.2d at 539.

7. *Id.*

8. *Id.*

9. Record at 94.

10. *See Cacy v. Cacy,* 619 P.2d 200, 202 (Okla. 1980); *see also* 6 Okla. City U.L.Rev. 845, 847 (1981).

therefore, did not take under the contractual will. We find the law contrary to both of these findings.

■ The specific agreement of the parties to the mutual will, that the survivor agreed not to revoke, alter or amend the will, carried with it an implicit agreement by the survivor to see to it that the testamentary intent expressed in the mutual will be carried out and to make no disposition of the estate property inconsistent with that intent. According to the attorney who drew the mutual will both Clyde and Mary were specifically advised that this was the effect of their contractual will. The matter was again clarified for the survivor, Clyde, at a time when he could have elected to take under the law rather than under the will. He elected to take under the will and thereby became bound by its contractual provisions. The fact that the survivor could use the property during his lifetime did not authorize him to arrange his affairs so that upon his death his widow would succeed him.[11] Further, it is undisputed that the property which was the subject of the contractual will, was intact at Clyde's death even though the legal title was in his surviving spouse, Stella.

■ As to the argument of Appellants that Clyde and Mary's estate was held in joint tenancy and therefore did not pass to Clyde pursuant to the will rather by virtue of his being the surviving joint tenant, it is sufficient to say, as we said in *Bleakley v. Bowlby*,[12] even property held in joint tenancy may be included in a testamentary disposition, if the parties so agree and the result is not contrary to law. There the court stated:

> [T]he will discloses a clear intent to make disposition of all their property on the death of the survivor, even the property passing to the survivor outside the terms of the will.
>
> . . . .
>
> [T]heir estate plan as disclosed by the will evidences a clear intent on their part that all their property, *whether it was held in joint tenancy with right of survivorship* or as tenants in common, was to vest unconditionally in equal shares to plaintiff and defendant upon the death of the survivor.[13]

Moreover, in *Alexander v. Alexander*,[14] it was stated that "[t]he survivor [in joint tenancy] will get the legal title and unless he takes the title through fraud or in trust, he will get the beneficial interest." Admittedly, there is no evidence that Clyde signed and executed the mutual contractual will with the intent to defraud Mary,[15] or the beneficiaries. Nor is there language in the will indicating that the estate was to be held by the survivor "in trust" for the beneficiaries.

We have stated however, that even if Clyde did not hold the funds "in trust" for the named beneficiaries, he was under a

---

11. *See Foulds,* 103 N.M. at 364, 707 P.2d at 1174,

> What the case holds, . . . is that the survivor in the joint will situation has an interest analogous to a life estate. The survivor may freely use the estate and may convert it from one form to another. What the survivor may not do is defeat the contractual agreement. Whether by gift, will, or creation of a P.O.D. account, the survivor may not convey what he/she had previously promised to dispose of by joint will. The survivor's subsequent intent is irrelevant.

and *In Re Estate of Chayka,* 47 Wis.2d at 108, 176 N.W.2d at 564,

> The duty of good faith is an implied condition in every contract, including a contract to make a joint will, and the transfers here violate such good faith standard by leaving the will in effect but giving away the properties which the parties agreed were to be bequeathed at the death of both to a designated party. The contract to make a will, once partially executed and irrevocable, is not to be defeated or evaded by what has been termed "completely and deliberately denuding himself of his assets after entering into a bargain."

12. 557 P.2d 894 (Okla.1976).

13. *Bleakley,* 557 P.2d at 897–98.

14. 538 P.2d 200, 203 (Okla.1975).

15. *But see* 6 Okla. City U.L.Rev. 845, 846 (1981) ("A confidential relationship between grantor and grantee gives rise to a presumption of fraud in the inducement, especially if the grantee is not a natural object of the grantor's bounty. A constructive trust may be imposed where necessary to prevent the abuse of this confidential relationship from resulting in unjust enrichment.")

contractual duty to see that his actions did not intentionally defeat the testamentary disposition. Based on this, the trial court found Clyde's actions were unconscionable in first accepting benefits under Mary's will greater than what he would have received had he not taken under that will, and then breaching the written contract by executing, shortly thereafter, the first of several subsequent wills, all of which defeated the intent of the contractual will, and finally, by placing the acquired property in joint tenancy with his second wife.

Appellees argue that these actions do not constitute fraud, citing as support *Easterling v. Ferris,*[16] and therefore, the trial court erred in imposing a constructive trust. In *Easterling* the court held that:

> [A]n element of unfairness in allowing the legal title holder to retain the property is not sufficient to justify the imposition of a constructive trust. There must also be some active wrongdoing on the part of the person against whom recovery is sought....
>
> ....
>
> Further, the evidence of wrong doing must be clear, unequivocal and decisive beyond a reasonable doubt.[17]

The opinion in *Easterling* recited that after a review of the evidence it was found not sufficient to impose a constructive trust saying in effect that at most, the record established a simple breach of an oral contract.[18]

While we reaffirm what we said in *Easterling,* we do not find that decision dispositive of the present matter. In *Cacy v. Cacy,*[19] this court stated that:

> The primary reason for imposing a constructive trust is to avoid unjust enrichment. A constructive trust is an involuntary or implied trust by operation of law. It is imposed against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or ques-

tionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. One obtaining legal title to property by fraud, or by violation of a confidence or fiduciary relationship, or in any unconscionable manner, can not equitably retain title.

■ There is no question that Clyde and Mary executed a contractual will in order to make a testamentary disposition. Clyde breached this contractual will by revoking it and executing subsequent wills. While his failure to perform as promised may not in itself give rise to a constructive trust, this act, in conjunction with the other evidence presented, that he intended to defeat the testamentary disposition of the contractual will by putting the property into joint tenancy with his second wife and that he changed the disposition of his property in the later will does give rise to such a trust. The court was justified therefore in ruling that a constructive trust be imposed on Clyde's estate.

■ However, Appellants dispute the trial court's finding that Appellees met their burden in proving that the constructive trust should be imposed on Clyde's *entire* estate. Appellants argue that the increase in Clyde's estate or at least a portion of it, resulted from services provided by Stella to Clyde and that she is therefore entitled to a share of it. Appellees attributed the increase in the estate to high interest rates.

While we note that the evidence submitted by Appellees was highly circumstantial as proof as to what constituted the increase in Clyde and Mary's estate that subsequently came into the marital estate of Clyde and Stella, the fact remains that there was evidence to sustain such a finding. The parties stipulated that at Mary's death in 1979, the value of the estate that Clyde took by way of the will was one hundred thousand dollars ($100,000).

16. 651 P.2d 677 (Okla.1982).

17. *Easterling,* 651 P.2d at 680–81.

18. *Easterling,* 651 P.2d at 681.

19. 619 P.2d 200, 202 (Okla.1980).

Clyde's attorney who drew up the first of the four subsequent wills testified that the estate was worth in 1980, one hundred and seven thousand five hundred seventy-three dollars ($107,573.00). At Clyde's death in 1985, his estate tax return evidenced that the value of the property passing to his spouse was one hundred and twenty-three thousand fifty-six dollars and twelve cents ($123,056.12). However, the final value of the estate as presented in evidence by Appellees was that the total estate was worth one hundred eighty-seven thousand, five hundred ninety-two dollars and fifty-nine cents ($187,592.59). This amount included a fifty thousand dollar ($50,000) certificate of deposit plus four thousand nine hundred sixty-eight dollars and thirty-seven cents ($4,968.37) of earned interest, plus the interest paid to Stella, nine thousand five hundred sixty-eight dollars and thirty-seven cents ($9,568.37), after Clyde' death on the various certificates of deposit held jointly by Clyde and Stella prior to his death. Further evidence established that during the marriage, Clyde contributed approximately ninety-three thousand and four hundred dollars ($93,400.00) and Stella, thirty-eight thousand and eight hundred fifty-four ($38,854.00). The trial court determined that since the testamentary devise was to include after acquired property, once Appellees presented evidence as to the value of the estate at Clyde's death, as well as present evidence that the proceeds of the estate could be traced back to their original source, Appellees had sustained their burden of proof. We agree with the trial court's ruling.

As to Appellant's argument that Stella should be compensated for her services, we acknowledge that no evidence was presented that Stella was anything less than a loving wife. However, this court has previously held that absent an express agreement to the contrary, a spouse is not entitled to compensation for services rendered.[20] While certainly this case presents

competing equities that deserve the court's consideration, the record reflects that the trial court took into account evidence presented as to what contributions Stella made during her marriage to Clyde in the accounting process of the case and applied the law accordingly.

■ Appellants had their opportunity to present evidence as to what set-offs or compensation they were entitled. However, Appellants argue that the trial court erred in requiring them to prove entitlement to any set-off. They contend that it was Appellees' burden to prove what part of the estate they were entitled to, if any. We disagree. Appellees proved under the contractual will that the constructive trust should be imposed on the entire estate as valued at Clyde's death. It was therefore, Appellant's burden to prove in the accounting process what part of the property that they were entitled to reclaim.

■ Finally, Appellants contest the trial court's determination that Stella would not take the property by right of survivorship since title had vested in her when Clyde placed the certificates of deposit in joint tenancy. We find no merit to the argument. Clyde was under a contractual obligation to not defeat the testamentary intent of the will and could not circumvent this intent by completely and unjustifiably depleting the bulk of the estate. Therefore, the transfers into joint tenancy with Stella were without effect.

### III. REVIEW OF ISSUES NOT ADDRESSED BY THE COURT OF APPEALS

■ Appellants raise the issue that the trial court erred in not awarding Stella her intestate share of Clyde's estate. However, even if Stella were to file to take her intestate share, the most that she would be entitled to is her share of the property that

---

**20.** *Catron v. First National Bank and Trust Company of Tulsa,* 434 P.2d 263, 267 (Okla.1967) "[S]ervices rendered by a wife to her husband are presumed to be gratuitous and without expectation of consideration, absent an express agreement to the contrary." Though we acknowledge that the *Catron* court discussed exceptions to the this general rule of law, we do not find them applicable in the present case.

was *acquired during the marriage.*[21] Since the contractual will Clyde entered into with Mary clearly expressed the intent to include after acquired property in the testamentary devise, we find that the trial court correctly determined that all of Clyde's estate, even the increase to his estate, could not be considered part of the marital estate of Clyde and Stella and disallowed any set-off for an intestate share.[22]

■ Appellants further submit that Appellees have failed to follow the proper procedure by not first filing a claim with the estate and only then seeking any equitable remedies. For this proposition Appellants cite *Bleakley v. Bowlby.*[23] While the parties in *Bleakley* did indeed pursue this course of action, the holding does not support Appellants' proposition that this was procedurally correct, merely that the parties chose to undertake such a course of action.

Indeed, in *Peyton v. McCaslin,*[24] this court determined that, "[t]he subject of trusts and the control of trust estates is cognizable only by courts of equity."[25] In a case analogous to the present one, *Cook et al. v. Hahn et al.,*[26] the court stated that, "[t]his action is primarily in the nature of one to enforce specific performance of a contract and to impress the subject matter thereof with a trust, which brings it clearly within the jurisdiction of the district court." Therefore, Appellees were not required to file their claims in the probate matter.

Appellants final proposition that we address regards the district court's immediate disbursement of the fifty thousand dollars ($50,000.00) granted Appellees under Clyde's will. As it was not disputed that Appellees were entitled to this amount the trial court granted immediate disbursement. Appellants argue that this was error on behalf of the trial court. This court however, stayed the trial court's order pending appeal and in rendering this decision, the right to the money has now been determined.

## IV. CONCLUSION

Our standard of review in an equitable action is that "[o]rdinarily this court must affirm the judgment of the trial court sitting in equity unless it is found to be against the clear weight of the evidence."[27] We find that the trial court's ruling was not against the clear weight of the evidence and therefore, VACATE the Court of Appeals' opinion and AFFIRM the judgment of the trial court.

HARGRAVE, C.J., and HODGES, SIMMS, DOOLIN, ALMA WILSON and KAUGER, JJ., concur.

SUMMERS, J., concurs by reason of stare decisis.

OPALA, V.C.J., concurs in judgment.

---

**21.** *See Redefining Inheritance: A Look at the New Law,* Downing, 56 OBJ 727, 730 (1985).

Since the elective share applies only to JIDC property, [joint industry during coverture] the perceived danger (or windfall) of a second or subsequent spouse being entitled to a substantial share has been removed by statute. Only the property acquired during the marriage qualifies for the elective share, which seems to be particularly equitable in the short-term marriage.

**22.** It should be noted that the trial court did determine that Stella was entitled to a life insurance policy on Clyde. The court held that Stella should receive this as the proceeds were not part of Clyde and Mary's estate and did not materialize until Clyde's death.

**23.** 557 P.2d 894 (Okla.1976).

**24.** 417 P.2d 316 (Okla.1966).

**25.** *Peyton,* 417 P.2d at 320.

**26.** 198 Okla. 364, 366, 178 P.2d 894, 896 (1947).

**27.** *Roll Form Products, Inc. v. State Ins. Fund,* 733 P.2d 426, 428 (Okla.App.1987) citing *Wetsel v. Johnson,* 468 P.2d 479 (Okla.1970).