918 P.2d 1354

**In the Matter of the ESTATE OF Lucille C. KERR, deceased,**

**Radonna Kerr BAILEY, Petitioner–Appellant,**

v.

**Tommy L. CALDWELL, Respondent–Appellee.**

No. 16505.

Court of Appeals of New Mexico.

May 9, 1996.

Certiorari Denied June 20, 1996.

Stuart D. Shanor, James A. Gillespie, Hinkle, Cox, Eaton, Coffield & Hensley, P.L.L.C., Roswell, for Appellant.

John W. Reynolds, Silver City, for Appellee.

## OPINION

APODACA, Chief Judge.

1. Petitioner Radonna Kerr Bailey appeals from the trial court's judgment denying her petition to probate the will of her stepmother, Lucille Kerr (Mrs. Kerr). Petitioner raises five issues on appeal that we consolidate as four issues: (1) whether L.D. Kerr (Mr. Kerr) and Mrs. Kerr executed valid mutual wills, (2) whether Mr. Kerr's will was revoked prior to his death, (3) if not, whether Mrs. Kerr's will was revoked following Mr. Kerr's death, allowing her to place her property in joint tenancy with her natural son, Respondent Tommy Caldwell, and (4) whether Respondent exerted undue influence on Mrs. Kerr to obtain her estate. We hold that the Kerrs executed valid mutual wills that were not revoked before Mr. Kerr's death. For that reason, Mrs. Kerr was prohibited from revoking her will or from otherwise disposing of the property subject to the wills. We therefore reverse and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

2. Mr. and Mrs. Kerr were married in New Mexico in 1968. They brought five children to the marriage from their previous marriages but had no children together. Mr. and Mrs. Kerr had a happy relationship with each other and a good and accepting relationship with their children and stepchildren. In

1973, the Kerrs drafted and properly executed wills in New Mexico with the same dispositive provisions, including a provision reciting the mutuality of the wills and purporting to restrict the right of each testator to revoke his or her will. The wills stated that all of the parties' property would go to the surviving spouse and, upon the death of the survivor, the combined estate would pass in equal shares to the five children, or, if they were deceased, to their issue. The respective wills provided that the surviving spouse of each testator would be executor of the deceased spouse's will and that the alternate co-executors would be Petitioner and Respondent. The wills remained in the custody of the drafting attorneys until 1981, when the Kerrs removed the originals from the law firm's office in New Mexico and moved to Arkansas. The attorneys kept copies of the wills.

3. After the execution of the wills, the Kerrs began acquiring property that they placed in both of their names as joint tenants with rights of survivorship. They also bought a variable life insurance policy (with Mrs. Kerr as the policy owner and named insured) that, like the wills, provided for the benefits to be distributed equally among the five children upon her death.

4. In 1990, Mr. Kerr died. Mrs. Kerr was advised by her Arkansas attorney that it was unnecessary to probate Mr. Kerr's estate because most of it had been placed in joint tenancy with her. Thus, Mr. Kerr's estate was not probated. However, Mrs. Kerr told several members of her and Mr. Kerr's families about the plan of equal division of their estate among the five children upon her death. Mrs. Kerr then left Arkansas and returned to New Mexico.

5. After her move, Mrs. Kerr cashed an account that she acquired through joint tenancy with Mr. Kerr and placed the proceeds in a certificate of deposit in joint tenancy with Respondent. She then executed a durable power of attorney to Respondent. With this authority, Respondent transferred all of Mrs. Kerr's real estate into his and his mother's names as joint tenants. Mrs. Kerr later

ratified these transfers and transferred certain personal property into joint tenancy with Respondent. Upon Mrs. Kerr's death in 1993, all of her property transferred in joint tenancy to Respondent. Respondent processed the insurance policy so that each child received equal shares. No one has been able to find either Mr. or Mrs. Kerr's original wills.

## II. DISCUSSION

### A. Preliminary Matters

■ 6. Respondent contends that Petitioner did not properly object to any of the findings of the trial court pursuant to SCRA 1986, 12–213(A)(3) (Cum.Supp.1995). *See Cordova v. Broadbent*, 107 N.M. 215, 216, 755 P.2d 59, 60 (1988) ("Unchallenged trial court findings ... are binding on appeal."). We reject the contention. Petitioner does not challenge any of the trial court's findings of historical fact. She challenges only the inferences and legal conclusions that the trial court derived from those historical facts. The brief in chief sets forth precisely the manner in which the trial court allegedly erred. At most, Petitioner committed a technical violation that in no way hampers this Court's ability to conduct its review. *Thomas v. City of Santa Fe*, 112 N.M. 456, 459, 816 P.2d 525, 528 (Ct.App.), *cert. denied*, 112 N.M. 308, 815 P.2d 161 (1991).

■ 7. The wills were executed in New Mexico and the majority of the property in question is situated here. The parties agree that New Mexico law is controlling. We review the evidence in the light most favorable to the trial court's judgment. *Spencer v. Gutierrez*, 99 N.M. 712, 715, 663 P.2d 371, 374 (Ct.App.), *cert. denied*, 99 N.M. 644, 662 P.2d 645 (1983).

### B. Were The Wills Executed By Mr. And Mrs. Kerr Mutual Wills?

■ 8. Petitioner argues that the wills executed by Mr. and Mrs. Kerr were mutual wills. " 'Mutual wills' are defined as wills

executed pursuant to an agreement between testators to dispose of their property in a particular manner, each in consideration of the other." *Foulds v. First Nat'l Bank,* 103 N.M. 361, 363 n. 1, 707 P.2d 1171, 1173 n. 1 (1985). The trial court determined that the wills were not mutual wills but were instead mirror wills not subject to any binding or irrevocability provisions. The court stated that the wills did not constitute mutual wills because they did "not meet the criteria of Section 45–2–701, NMSA 1978, which was in effect at the time [the] wills were executed and which at that time would have required [the wills] to comply with the provisions of that statute."[1] The trial court erred with respect to the effective date of the statute. When it was passed in 1975, NMSA 1978, Section 45–2–701 (Repl.Pamp.1989), stated in part, "A contract to make a will or devise, or not to revoke a will or devise, or to die intestate, *if executed after the effective date of the Probate Code,* can be established only by [the following means]." (Emphasis added.) The effective date of the Probate Code was July 1, 1976. Mr. and Mrs. Kerr's wills, however, were drafted in 1973, three years before the effective date of the Probate Code. Thus, any contractual provisions of the Kerrs' wills were not subject to the provisions of Section 45–2–701. Consequently, it was error for the trial court to hold those contractual provisions to that statute's requirements.

9. Respondent argues that *In re Estate of Vincioni,* 102 N.M. 576, 698 P.2d 446 (Ct. App.), *cert. denied,* 102 N.M. 613, 698 P.2d 886 (1985), is controlling. Respondent is mistaken. First, because the purported wills in *Vincioni* were drafted after the adoption of the Probate Code (unlike the wills here), they were subject to the requirements of Section 45–2–701. Second, the petitioners in *Vincioni* attempted to prove an oral contract to make a will through extrinsic evidence. Here, Petitioner argues that the contract is evidenced within the written will, and Re-

spondent does not dispute the authenticity or accuracy of the copies.

10. Before adoption of the Uniform Probate Code, oral or written agreements were enforced if proved by clear, convincing, and satisfactory evidence. *Vincioni,* 102 N.M. at 582, 698 P.2d at 452 (because wills are ambulatory in nature, any agreement restricting right to revoke must be proven by clear, satisfactory, and convincing evidence); *Schauer v. Schauer,* 43 N.M. 209, 213, 89 P.2d 521, 523 (1939).

11. The pertinent provisions of the Kerrs' wills stated:

### III.

### *DISPOSITION OF PERSONAL EFFECTS:*

I bequeath all automobiles, wearing apparel, jewelry, silverware, books, household goods and equipment and tangible personal belongings [that] I own at my death:

A. To my [spouse], if [he/she] survives me; or

B. If my [spouse] does not survive me, to my children and stepchildren hereinabove named in equal shares.

### IV.

### *DISPOSITION OF RESIDUE OF MY ESTATE:*

I devise and bequeath the residue of my estate, consisting of all property of every nature owned by me at my death or acquired by my estate and not effectively disposed of by the preceding Articles of this Will, as follows:

A. To my [spouse], if [he/she] survives me; or

B. If my [spouse] does not survive me, as follows:

---

1. Probate Code Section 45–2–701 (Repl. Pamp.1989) was entitled "Contracts concerning succession" and the current version is compiled at NMSA 1978, Section 45–2–514 (Repl. Pamp.1995).

1. To my son, LESTER ROBBIE KERR, or his issue, one fifth (⅕) part or share.

2. To my son, WRIGHT CONWAY KERR, or his issue, one-fifth (⅕) part of share.

3. To my daughter, RADONNA KERR BAILEY, or her issue, one-fifth (⅕) part or share.

4. To my stepson, TOMMY CALD-WELL, or his issue, one-fifth (⅕) part or share.

5. To my stepson, RONNIE CALD-WELL, or his issue, one-fifth (⅕) part or share.

C. Should one or more of the devisees named above die without leaving surviving issue, then and in that event said legacy shall lapse.

. . . .

### VII.

### *MUTUALITY:*

This Will is a reciprocal Will and has been made contemporaneously with a Will executed this date by my spouse [that] is likewise mutually reciprocal. Said Wills shall not be revokable in any manner unless a mutual agreement for revocation is reached.

12. The Kerrs' contractual agreement evidencing mutual wills was reflected by the language contained in the wills. First, identical language in both wills indicated that the Kerrs' combined property be jointly disbursed in the same manner to the same beneficiaries, with no discretion by either party. *See Robison v. Graham,* 799 P.2d 610, 614 (Okla.1990) (evidence of mutual wills when spouses' wills stated that respective property left to surviving spouse and, upon

death of survivor, given to same enumerated devisees); *cf. Lindley,* 67 N.M. at 445, 356 P.2d at 458 (no mutual wills where surviving wife had discretion to distribute property); *McDonald v. Polansky,* 48 N.M. 518, 525, 153 P.2d 670, 674–75 (1944) (no mutual wills where wills made individual dispositions instead of joint dispositions and no language stating that beneficiaries would take when surviving spouse died). Second, the language expressly restricted the surviving spouse from unilaterally revoking the wills unless both parties agreed to rescind, indicating that the identical wills constituted an agreement. *Cf. Lindley,* 67 N.M. at 444–45, 356 P.2d at 458 (use of first person plural pronouns alone not strong enough to indicate agreement). Third, the fact that the Kerrs made a will in which their respective stepchildren were beneficiaries was evidence of a mutual contract. *Schauer,* 43 N.M. at 213, 89 P.2d at 524. Fourth, there were two co-executors named apart from the survivor's spouse, and provisions were made in the event one of the beneficiaries predeceased the testators. These facts indicate that the wills were to be long-lasting. *Cf. Lindley,* 67 N.M. at 445, 356 P.2d at 458 (evidence against mutual wills where no alternate executor if spouse died and no provisions if any beneficiaries died). Therefore, the unambiguous language of Section VII, the provisions of the will as a whole, and the effect of those provisions all support the natural reading of the section. We thus hold that the trial court erred in holding that the wills were not mutual, irrevocable wills.[2]

### C. Was Mr. Kerr's Will Revoked Prior To His Death?

#### 1. Joint Tenancy

■ 13. The trial court found that the Kerrs' "practice of placing their property in joint tenancy during their marriage impliedly

**2.** We agree with Judge Hartz that the question before us is whether the language in the wills created a contract limiting the disposition of the property by the survivor. Judge Hartz considers the express mutuality provision in Section VII to be unambiguous, thus absolutely controlling and final. We agree that the language is unambiguous. However, being mindful that the existence of such an agreement must be proved by clear and convincing evidence, we have examined other parts of the wills to buttress our interpretation of the mutuality provisions.

revoked the mutuality provisions of their wills with respect to the property placed in joint tenancy." The wills stated that they "shall not be [revocable] in any manner unless a mutual agreement for revocation is reached." The trial court thus must have determined that the Kerrs' action of placing their property in joint tenancy constituted an agreement for revocation as contemplated by the wills. We cannot agree. Placing property in joint tenancy is a common method by which spouses transfer property upon death for the sole purpose of avoiding costs of probate. Placing the spouses' property in joint tenancy is in no way inconsistent with an agreement that the surviving spouse shall distribute at death all property (including property that the surviving spouse acquired through joint tenancy) in a particular manner. *See Powell v. American Charter Fed. Sav. & Loan Ass'n,* 245 Neb. 551, 514 N.W.2d 326, 333 (1994) ("The fact that joint tenancy property passes to the survivor by title does not prevent the property from being designated as subject to the terms of the will."); *Robison,* 799 P.2d at 615 (property held in joint tenancy can be included in a testamentary disposition if the parties agree and result not contrary to law); *In re Estate of Bell,* 6 Ill.App.3d 802, 286 N.E.2d 589 (1972); *Tiemann v. Kampmeier,* 252 Iowa 587, 107 N.W.2d 689, 691–92 (1961); *Olsen v. Olsen,* 189 Misc. 1046, 70 N.Y.S.2d 838, 844 (Sup.Ct.1947); *cf. Brown v. Heller,* 30 N.M. 1, 10–11, 227 P. 594, 596–97 (1924) (conveyance of property *by deed during testator's life* adeemed will to the extent of that property). *But see Rogers v. Rogers,* 136 Mich. App. 125, 356 N.W.2d 288, 292–94 (1984). In fact, the Kerrs' intent to maintain all property, including joint tenancy property, subject to the terms of the wills (i.e. governed by the contract stated in the wills) was apparent in the language of the wills. That language indicated that the property to be governed consisted of "*all property of every nature* owned by me at my death or acquired by my

estate...." (Emphasis added.) In particular, the Kerrs' placing their property in joint tenancy with one another does not contravene the disposition of property set forth in Section IV of the will. Therefore, the fact that the Kerrs placed most of their property in joint tenancy cannot, without more, support a finding that a mutual agreement for revocation had been reached. *See Bleakley v. Bowlby,* 557 P.2d 894, 897–98 (Okla.1976) (language of will disclosed clear intent to dispose of all property upon death of survivor, including property passing in joint tenancy).

## 2. Lost Wills

14. Although the party claiming revocation has the burden of establishing that fact, *Albuquerque Nat'l Bank v. Johnson,* 74 N.M. 69, 72, 390 P.2d 657, 660 (1964), it will be presumed that the testators destroyed the instruments with the intention of revoking them if the one asserting the existence of the wills fails to give an explanation for the absence of wills that were in the testators' possession or in a place to which they had ready access. *Perschbacher v. Moseley,* 75 N.M. 252, 254, 403 P.2d 693, 695 (1965). In addition to accounting for nonproduction of the will, the proponent of the missing document must prove its due execution, its contents, and facts or circumstances indicating its non-revocation by clear, satisfactory, and convincing evidence. *Barngrover v. Estate of Barngrover,* 95 N.M. 42, 46, 618 P.2d 386, 390 (Ct.App.1980).

15. The trial court determined that, because no one had seen the wills since the Kerrs picked them up at the law firm in 1981 and there was no other explanation for their absence, the presumption of revocation arose. Because neither party disputes the fact that the wills have not been seen, we determine that the trial court did not err in concluding that a presumption of revocation arose.[3]

**3.** We agree with Judge Hartz that the trial court made no express finding that Mr. Kerr's will was missing at the time of his death. We believe, however, that that finding was implicit in the

court's other findings, especially in Finding 31, which found that no one had seen the originals of both wills since they had been picked up by Mr. and Mrs. Kerr at their attorneys' offices in

However, even viewing the evidence in the light most favorable to the trial court, we disagree with the trial court that Petitioner did not present clear and convincing evidence to show the existence of the wills at Mr. Kerr's death to overcome the presumption.

16. Facts indicating that the wills were in existence at the time of Mr. Kerr's death include: (1) a letter from Mrs. Kerr's attorney indicating that he believed it would not be financially prudent to probate Mr. Kerr's estate (the letter indicated that Mr. Kerr's property "would not pay for the cost of any kind of administration of the estate in order to vest the property in her."),[4] (2) testimony from Petitioner that, after Mr. Kerr's death, Mrs. Kerr showed her an envelope, presumably containing the wills, and stated that she was not sure if the wills needed to be probated, (3) testimony from Mrs. Kerr's sister that, after Mr. Kerr's death, she saw a will (but did not see its contents), (4) testimony from Respondent's brother that, after Mr. Kerr's death, Mrs. Kerr stated that her property was to be divided evenly among the five children and that Petitioner and Respondent were co-executors for the wills, and (5) testimony from another of Mrs. Kerr's sisters and a sister-in-law that, after Mr. Kerr's death, Mrs. Kerr stated that her will would divide up the estate property equally after her death.

17. In the face of these facts, Respondent argues that the Kerrs never made any statement about the wills in his presence. He also contends that, when the Kerrs purchased a life insurance policy, the proceeds of which were to be divided equally among their children, this action constituted conclusive evidence that the wills had been replaced. We disagree. First, the failure to mention the wills in Respondent's presence did not mean they did not exist. In fact, as previously noted, there were several people to whom the Kerrs apparently did mention the wills, rebutting Respondent's contention. Second, when the Kerrs met with an attorney to prepare living wills six weeks before Mr. Kerr died and Mr. Kerr responded that he did not need a regular will because he already had one, this was several years *after* the purchase of the life insurance policy and thus would be an odd response if he had intended the policy to supersede the will. We therefore determine that, although the trial court did not err in finding a presumption of revocation, it did err in concluding that the presumption was not properly rebutted.

18. We are cognizant that the trial court is the fact finder and that it could have determined that two of the witnesses on behalf of Petitioner were not credible because they were testifying in their own financial interest. However, even assuming this was the case, four of the witnesses had absolutely no stake in the matter, and all of the witnesses (both interested and disinterested) testified to a broad, consistent, and specific range of facts indicating that the wills existed after Mr. Kerr's death. Thus, we determine that the wills were undisputably properly executed, the contents were evidenced in the copies, and the facts and circumstances, even viewed in the light most favorable to the trial court, clearly and convincingly indicated the existence of the wills at Mr. Kerr's death. Most likely, the wills were not produced at Mr. Kerr's death simply because Mrs. Kerr was advised that it would not be prudent to probate Mr. Kerr's will.

## D. Could Mrs. Kerr Revoke Her Own Will After Mr. Kerr's Death?

19. The trial court concluded that (1) Mrs. Kerr revoked her will when she ratified

---

New Mexico before they moved to Arkansas. Viewing the court's findings in the light most favorable to the trial court, as we must, we conclude that the court implicitly found that Mr. Kerr's will was missing at the time of his death. For that reason, we believe a presumption could have arisen that the will had been destroyed, thus requiring rebuttal.

4. Respondent argues that the letter referred to intestacy proceedings. However, under Arkansas law (the state in which the Kerrs resided at Mr. Kerr's death), Mr. Kerr's property would not vest in Mrs. Kerr through intestacy but would vest in his natural children, subject to a one-third dower interest of Mrs. Kerr.

Respondent's action of placing her property in joint tenancy with him, *In re Estate of Heeter*, 113 N.M. 691, 694, 831 P.2d 990, 993 (Ct.App.) (once joint account established, law presumes right of survivorship), *cert. denied*, 113 N.M. 690, 831 P.2d 989 (1992), and (2) because no one could presently· find Mrs. Kerr's will (which she had in her exclusive possession), a rebuttable presumption arose that her will was revoked prior to her death.

20. Mutual wills become irrevocable once a party to one of the contractual wills dies. *Foulds*, 103 N.M. at 363, 707 P.2d at 1173. The provisions of the contractual will are binding once the survivor accepts the benefits provided under the agreement. *Id.* The fact that much of the survivor's property passes through joint tenancy does not prevent it from being subject to the terms of the wills. *See id.*; *Powell*, 514 N.W.2d at 333; *Robison*, 799 P.2d at 612–16 (surviving spouse probated mutual will, accepted benefits and then, instead of honoring the provisions of the contract, placed property in joint tenancy with another; court invalidated transaction stating that surviving spouse had contractual duty not to intentionally defeat testamentary disposition). The fact that no one can locate Mrs. Kerr's will now is irrelevant because it could not be revoked by Mrs. Kerr after Mr. Kerr's death.

21. Respondent contends that Mrs. Kerr was upset at Petitioner's son when he asked her for money and thus wanted to alter her estate distribution in retaliation. Respondent also notes that two of the children, including Petitioner, visited Mrs. Kerr, and she gave them $1000 in expense money and did not mention a will. We consider those facts insignificant. Once Mr. Kerr died and Mrs. Kerr accepted the property subject to the terms of the will, not only was she powerless to revoke either her or Mr. Kerr's will, but she also had a contractual obligation to ensure that the ultimate disposition of property to the five children was not jeopardized. *See Foulds*, 103 N.M. at 363–64, 707 P.2d at 1173–74 (survivor of a mutual will has an interest similar to a life estate and may freely use and convert estate as long as she does not defeat contractual agreement). The property that she placed in joint tenancy with Respondent was subject to the terms of the mutual wills, or, in other words, was to be divided five ways. *See id.* at 364, 707 P.2d at 1174; *Powell*, 514 N.W.2d at 334. Because there was no agreement with Respondent to honor the binding provisions of the mutual wills, Mrs. Kerr's act of placing her property in joint tenancy with him must be invalidated as contrary to her contractual obligation.

### E. Did Respondent Exhibit Undue Influence?

22. Because we reverse on the other issues and because the damages recoverable under the claim of tortious interference with an expected inheritance are the extent of one's inheritance (which Petitioner is entitled to under the mutual wills), we need not address this issue.

## III. CONCLUSION

23. We determine that the Kerrs executed valid mutual wills and that the evidence indicated the wills existed at the time of Mr. Kerr's death. It was therefore error for the trial court to deny Petitioner's petition to probate Mrs. Kerr's will. We reverse and remand for further proceedings consistent with this opinion. Petitioner is awarded costs on appeal.

24. **IT IS SO ORDERED.**

FLORES, J., concurs.

HARTZ, J., concurs in part and dissents in part.

HARTZ, Judge (concurring in part, dissenting in part).

25. I join in Chief Judge Apodaca's opinion except on two matters.

26. First, although I agree that the wills executed by Mr. and Mrs. Kerr were mutual

wills, my analysis of the matter is a bit different from that adopted by the majority. In my view, the issue is not sufficiency of the evidence. Rather, the issue is how to interpret certain written documents—the wills. After all, the historical facts are not disputed. The authenticity of the wills was not challenged. Therefore, the sole question is whether the language in the wills created a contract between the testators requiring the survivor to· dispose of their property in a particular manner. I would answer that question "Yes," because the language of the wills is unambiguous. Nothing in the terms of the wills or the circumstances surrounding their execution suggests that the Kerrs gave the words of the mutuality provision a meaning other than their natural meaning.

27. My second difference from the majority relates to the discussion of lost wills. Our Supreme Court has held that in a proceeding to probate a missing will that had been in the testator's possession or in a place to which the testator had ready access, it is presumed that the testator destroyed the will with the intention of revoking it if the proponent fails to give an explanation for the absence of the will. *Perschbacher v. Moseley,* 75 N.M. 252, 254, 403 P.2d 693, 694 (1965). I agree that a like presumption could apply with respect to Mr. Kerr's will, even though no one has sought or is seeking to probate it. But in translating that presumption to the present situation, it seems to me that the basis for invoking the presumption would have to be the failure to locate Mr. Kerr's will at the time of *his* death, not the failure to locate it at the time of *Mrs. Kerr's* death. *See Lich v. Carlin,* 184 Cal.App.2d 128, 7 Cal.Rptr. 555, 560 (1960); *Silvers v. Estate of Silvers,* 274

So.2d 20 (Fla.Dist.Ct.App.1973). Obviously, the disappearance of his will after his death could hardly be attributed to his decision to revoke it.

28. The district court made no finding that Mr. Kerr's will was missing at the time of his death. Hence, no presumption arose that Mr. Kerr had revoked his will by destroying it. There being no other evidence to support a finding that Mr. Kerr revoked his will, perhaps it would be appropriate to reverse outright the district court's finding that Mr. Kerr's will was revoked.

29. Nevertheless, the better procedure in this case would be to remand for further findings by the district court. Because the district court had alternative grounds for ruling against Petitioner, it may have thought it unnecessary to make a specific determination regarding whether Mr. Kerr's will existed at the time of his death. I agree with the majority that the evidence that the will existed at the time of his death appears persuasive. But the lens through which an appellate court views the evidence at trial is cloudy and astigmatic. I would defer to the district court on this factual issue.